Motion for notice to show cause why an alternative mandamus shall not issue, refused.
Motion, having the allegations set out in the petition as its foundation, for a writ of certiorari in the nature of a writ of error, to bring up the record for review — allowed.
The writ will be returnable forthwith.
Thereupon the certiorari was issued, and in obedience thereto, the clerk of Edgecombe court returned a transcript from the minutes of the above term, by which it appeared that on Monday the 6th of December, the petitioner had been called upon, by a rule, to show cause upon Thursday the 9th, why he should not "be (206) disabled from hereafter appearing as attorney and counsellor in court," it being set forth, as ground for such proceeding, that, as editor of the Tarboro' Southerner, he had published during the term, in the village of Tarboro,' an article, which was copied at length, but of which the judgment given below renders it necessary to set forth only this much: that, after referring to the Judge as, (in inverted commas) "His Honor," "Judge" etc., it proceeds to say that the charge to the grand jury was "almost identically similar with the one delivered here six months since, with this important exception, his Honor seems to have somewhat deserted the profane poetical masters, and confined most of his quotations to the Holy Scriptures — a happy omen, if it's possible to believe anything happy in such a character."
Upon Thursday the respondent appeared, and answered under oath:
"1. That as attorney and counsellor in this court, he has ever been respectful both in deportment and language to his Honor Judge E. W. Jones, and disavows having ever entertained any intention of committing a contempt of the court, or any purpose to destroy or impair its authority or the respect due thereto.
2. That he admits the writing and publishing of the article headed `Edgecombe Superior Court,' in the newspaper, Tarboro' Southerner, but insists that he wrote and published the same as editor of said paper, and not as an attorney and counsellor at law, and he further insists that the said article is not libellous, and does not contain any comment as applied to a public elective officer not *Page 161 
allowed by the freedom of the press, as defined by the Constitution of the United States.
3. That he insists that by becoming an attorney and counsellor at law, he has not surrendered any right as an editor, and as such he is entitled, according to every republican idea of the `freedom of the press' to fully comment on all public officers, a right that ought never to be restrained except for abuse, and that, before he is held responsible for any alleged abuse, he is entitled to a trial by a jury of his countrymen."
Thereupon, on Friday, his Honor, being of opinion that paragraph 1, in the answer was not responsive to the rule; and besides, as regards paragraphs 2, and 3 that, by assuming the character (207) of an editor, an attorney was not freed in any degree, from the respect otherwise due to the court, made the rule absolute, and disbarred the respondent.
The respondent asked for an appeal. But the court, thinking that, if he were entitled to one, he would have to conform to the provisions of the Code applicable thereto, declined to consider the motion.
The transcript having been returned to the effect above, —
Moore, with whom were Fowle Badger, argued as follows:
1. The common law of England, respecting contempts of court, is the law of this State, except so far as it may have been changed by our political situation, and the act of the General Assembly, concerning contempts, of April 10th 1869.
2. It is confidently submitted, that this act embraces all the matters, which can now constitute contempts of State courts, and utterly displaces the common law upon the subject; just as did the act of Congress of 1831. The great purpose of the Code C. P., was to supersede the existing law, both common and statute, and introduce new rules for judicial action, procedure and practice. This is shown by the radical changed in the constitution and laws, as announced by Art. 4, §§ 1, 2, and 3.
The act professes, as well by its title, as by its specific enumeration of causes of contempt, to supersede the existing law, and substitute certain and defined rules for ascertaining and punishing every, act, which it intends to regard as a contempt. In this respect, the act follows the policy of many of the States of the Union, and especially that of Congress, as declared in the act of 1831, Ex PartePoulson, 15 Haz. Pa. Reg. 380; and as declared in the act of 1846, ch. 62, of this State. Rev. Code, ch. 31, sec. 113; Weaver v. Hamilton,47 N.C. 343. The recent act, in division 7, adds one other common law cause of contempt to those which were allowed (208) *Page 162 
under the act of 1846. This of itself, proves the legislative purpose to assume entire control of the subject, and regulate it thoroughly: For, by the common law, "any publication pending a suit, which reflects upon the court, the jury, the parties, the officers of the court, or the counsel, with regard to the suit, or which tends to influence the decision, is a contempt, punishable by attachment;" United States v. Duane, Wall. C. C. 102. Peck's trial, — Ex Parte, Poulson; while the recent act concerning contempts, specifies, in division 7, in express words, the sole
cause of contempt under this class to be "the publication of a grosslyinaccurate report of the proceedings in any court."
If the court can add one other cause, it may add one hundred, and render the act nugatory.
The act concerning contempts is the work of the commissioners appointed by the constitution to provide "a Code of the law of North Carolina." That they offered this act as a substitute for the entire body of law upon the subject, is apparent:
(1.) From the language of the first section, which declares that "any person guilty of any of the following acts may be punished for contempt;"
(2.) From the specific enumeration immediately following, of eight distinct causes of contempt, each of which was a well known cause of contempt at common law;
(3.) From sec. 2 of the Act, which declares and prescribes a specificpunishment "for contempt" — all contempts — of court thus manifestly intending not to leave undefined, or discretionary with the court, either the causes of contempts, the mode of their punishment by fine and imprisonment, or the amount of the punishment;
(4.) In further proof, that the act was intended to dispose of the whole question of contempts, we find that, after contempts are defined, and punished with specific punishments, it is expressly declared, under what circumstances, and before what magistrates, (209) contempts may be committed; when the causes shall be recorded, and the mode of bringing to trial the guilty party.
The supreme, superior, and inferior judicial officers are all invested with the same powers to commit for contempts, while sitting in thedischarge of official business. The chapter embraces every necessary legislative provision upon the subject. It declares:
(1.) What acts are contempts, and how they are to be punished;
(2.) By whom, contempts may be punished;
(3.) Whom and when courts of record may punish; and
(4.) Allows punishments amply sufficient to protect every court, while engaged in the administration of justice, against every kind *Page 163 
of disturbance and imposition from any and every source whatever. What other or higher "powers," in the language of Chief Justice Nash, in Weaverv. Hamilton, "can a well minded Judge desire to possess, further than is necessary to the proper transaction of the business before him." A contrary construction of the Acts leads to absurd consequences.
The publication complained of, if a contempt, is manifestly a very
trivial thing compared with many contempts designated by the Act. Now, if the publication be construed to be a contempt, and out of the Act, then the punishment, too, is out of the Act; and, while for the gravest contempts enumerated in that, a court would be restricted to a small fine and short imprisonment, for all others not enumerated therein, however small, any court, even that of a Justice of the Peace, would be left free to fine and imprison, without limit of amount or time; yea, and to disbar, too, if the offender were an attorney!!!
3. The court below seems clearly to admit that the publication, of itself, was not a contempt of court: For, had it been so, then the co-editor, Mr. Charles, would have been equally guilty, Yet he is not noticed in the rule. This construction of the Act, by Judge Jones, as applicable to newspaper publications, at this day and (210) in this State, is doubtless the true one, and is fully sustained by its language, its context, and by the interpretation put on the Act of 1846, in Weaver v.Hamilton; and on the Act of Congress of 1831, by Baldwin, Judge, In rePoulson. But if the publication be not a contempt in Charles, it can be so in Biggs, only because he was an attorney.
Such a construction is against reason, because the causes of contempt, which can be committed by Mr. Biggs, as an attorney, are as distinctly specified in the Act, as those which can be committed by Mr. Charles or Mr. Biggs as a man; and such a publication is not one of the acts specified or embraced in its language or meaning, by the broadest construction in regard to persons or attorney. If the common law be still open for Biggs as an attorney, it is open also for Charles as a man.
4. If, however, the recent Act respecting contempts, shall be construed so as not to disparage the common law jurisdiction, it is insisted, that the articles in the Southerner, respecting Hon. Edmund W. Jones, is not a contempt of court.
There is but one paragraph, so far as relates to the Judge, from which any expression of disrespect can be selected, which is as follows: *Page 164 
"His Honor seems to have somewhat deserted the service of the profane poetical masters, and confined most of his quotations to the Holy Scriptures — a happy omen, if it is possible to believe anything happy in such a character."
No exception can be taken to any part of this paragraph other than to what is contained in the words, "a happy omen, if it is possible to believe any thing happy, in such a character."
No definite offensive meaning can be given to the expression. The whole is but light ridicule. Nothing is uttered disrespectful of his official action. The repetition by a Judge, of his charge to the (211) grand jury, is but following the example of the illustrious Chief Justice Marshall; and the allusion to quotations in the charge, of poetry and the Scriptures, is too trifling for notice, on or off the bench.
5. By the common law of England respecting contempt, there can be, out of the presence of the Court, no contempt, of Court merely by language spoken or written of the person who may be its Judge, unless such language be spoken or written in reference to the official acts of the Judge: 4 Bl. Com. from 284 to 296; Charleton's case 14 E. Ch. Rep. 316, at 339 to 343; the King v. Watson, 2 T. R. 199.
There was no allusion in the publication to any official act, except that of charging the grand jury. Of this charge it is said only, that there was nothing new in it, except the substitution of scriptural quotations, in the place of quotations, previously used, from the profane poets.
In order to constitute contempt in other cases, by use of disrespectful language spoken or written of a person who is Judge, but not of his official acts, the language must be used of him while in the actualdischarge of his duties.
If spoken or written of the man, in a place where the language does not tend to disturb the Court, the words do not constitute a contempt. See cases cited as above.
6. But if the publication were, apparently, a contempt of Court, the respondent swore that he did not so intend it; and honestly separated his acts done as an attorney from those done as an editor.
He made this distinction upon oath; and upon his oath claimed constitutional rights under the distinction. Suppose that he was mistaken, was not a reprimand from the bench sufficient, or a fine or imprisonment for a short time? The punishment inflicted for so venial an offence, if offence it be, is unusual and unprecedented.
7. Attorneys, as to contempt of Court, stand upon the same footing with all other persons, unless the matter constituting the contempt be connected with the discharge of the duties of their office *Page 165 
as attorneys. In the case of the Executors of Atkins, 6 (212) E. C. L. 344-5. In the matter of Knight, 8 E. C. L. 259. In reFenton, 30 E. C. L. 129. 1 Salk 87, Pl. 5 Cocks v. Harman, 63 East 404, Bac. Abr. Att. (A) and (H)
The office of an attorney, and the vocation of an editor are wholly unlike.
8. If the contempt be of a character, which degrades and dishonors the moral standing of the man, and renders him unfit to practice as an attorney, such a contempt may perhaps, authorize a disbar without trial by jury. As if an attorney allow a person who is not an attorney to practice in his name; such conduct in England (always exceedingly careful of the integrity of her attorneys) is, (by statute 12 Ga. 2, c. 13 § 11) regarded as so gross a fraud and deception upon the public and the office of attorney, as to evince and proclaim a want of moral Status in the attorney, thus allowing the use of his name and the abuse of the office, Bac. Abr. Atty. (A) p. 290. In re Isaackson and others, 17 E. C. L. 106.
9. An attorney, who simply commits a disgraceful and degrading act, which is not connected with his profession, is not guilty of a contempt of court. Sergt. Hawkins in his learned work on crimes, treats at large of contempts to Courts; and under all the classifications of which they are susceptible. In B. 2, ch. 22, he notices all such as may be committed by attorneys in the discharge of their official duties, and among them,forgery of records, etc. For these and every species of contempt of Court, he declares the legal punishment to be fine and imprisonment. He nowhere notices disbarring, or striking from the roll, as a punishment for the misconduct of attorneys.
10. If an attorney, by an act of infamy, lose his moral Status, he is not struck from the roll because of contempt of Court, but "to keep free from reproach the profession of which he is a member."Ex parte Brounsall, Cowp. 829, 1 Ch. Cr. law 660. 1 Tidd. 89.The King v. Southerton, 6 E.R. 143. Jeromes case Cr. Ch. 74. (213)Ex parte Stokes, 18 E. C. L. 303 and notes (Ed. of 1856).
11. No practising attorney ought to be disbarred or struck from the roll, unless unfit to be entrusted with professional Status and character; or "found guilty of a moral delinquency in his private character." In reWallace, 1 Priv. Council Cases, 283 (1866.) Ex parte Burr, 9 Wheat. 529. Exparte Brounsall.
Even under the common law in England, writing "a letter addressed to the Chief Justice of a Court, reflecting on the Judges, and on the administration of justice generally in the Court," Although a letter of "a most reprehensible kind," and a contempt of Court which it was hardly possible for the Court to omit taking cognizance of, *Page 166 
furnishes no evidence of any sufficient delictum or of moral delinquency in private character, or of the want of "professional Status and character," which renders it expedient for the public interest, or protection of the Courts, to interfere with the Status of the individuals as a practitioner in the Court;" as is expressly held, In re Wallace.
The case of Brounsall represents the opinion of all the Judges of England in 1778, while that of Wallace is the judgment of the highest Court in England in 1866. The law in both is the same, and is now and ever has been the law of this State.
12. The idea of striking a practising attorney from the roll for a contempt of Court, which does not gravely affect his private character as a gentleman and a man of worth, is contrary to all English precedent.
13. The privilege to practice law, is an office, and is protected as property, 4 Bac. Abr., Mandamus (C) In Re Wallace, Ex Parte Bradley. ExParte Burr. Disfranchisement of ones office, for mere contempt unaccompanied with a loss of moral status, is a "cruel and unusual punishment," unknown, to, and forbidden by, the common law of England In ReWallace — Baggs case, 11 Rep. 93.
Such disfranchisement is a deprivation of the means of (214) living; and as a punishment is forbidden in England by those parts of Magna Carta, which constitute parts of our own Constitution in Sections 14 and 17. I conclude, therefore.
1. Every contempt, which can be lawfully noticed by a Court or other body acting judicially, is described in the act of April 1869, "concerning proceedings in contempt."
2. No contempt can be punished otherwise than is therein prescribed: to-wit, by fine or imprisonment, or by both — the fine not to exceed $250; the imprisonment not to be more than 30 days.
3. There is no rightful power to disbar a licensed practitioner but for the loss of moral status, that is, that the person is unfit to be trusted to discharge the high duties of an attorney.
4. If, in the investigation of a cause of contempt, such proof of moral delinquency, connected therewith shall appear, as to show the person to be unfit to practice, then the Court may punish for the contempt, and may also disbar, to rid the public of a faithless man who has become "a reproach to the profession of which he is a member."